*Frank W. Volk, Chief Judge*
*United States Bankruptcy Court*
*Southern District of West Virginia*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF WEST VIRGINIA**
**AT CHARLESTON**

| | |
|---|---|
| IN RE: | CASE NO. 2:15-20601 |
| JOSEPH LEE DIXON, | CHAPTER 13 |
| Debtor. | JUDGE FRANK W. VOLK |

**MEMORANDUM OPINION AND ORDER VALUING 2006 DOUBLEWIDE MOBILE HOME AND THE FIVE ACRES OF PROPERTY ON WHICH IT IS SITUATED, LOCATED ON O'POSSUM CREEK ROAD, VICTOR, WV 25938**

This matter came before the Court on Confirmation of Debtors' Chapter 13 Plan (Doc. 12) (the "Plan") and the objection of Vanderbilt Mortgage and Finance, Inc. (Doc. 22) (the "Objection"). Within the Plan was a Motion to Value Secured Property (the "Motion to Value"). The Court held a hearing on the Plan and Motion to Value on June 16, 2016, during which testimony and exhibits were presented. At the conclusion of the hearing, the Court took the matter under advisement.

Having considered the pleadings, the evidence admitted at the hearing, and the arguments of counsel, the Court enters the following findings of fact and conclusions of law pursuant to *Federal Rule of Civil Procedure* 52, as made applicable by *Federal Rule of Bankruptcy Procedure* 7052.

**I.**

The Court makes the following findings of fact based upon a preponderance of the evidence. The Debtor Joseph Lee Dixon became indebted to Vanderbilt Mortgage and Finance, Inc. ("Vanderbilt") on or about June 1, 2009, pursuant to a Manufactured Home Promissory Note, Security Agreement and Disclosure Statement (the "Loan"). *Objection*, Exh. A. The indebtedness

was secured by placing a lien on the Certificate of Title of a 2006 Fleetwood Mobile Home, Serial No. VAFL519AB61893AV13 (the "Collateral"). *Objection*, Exh. B. The original principal amount of the indebtedness was $75,397.29. The repayment terms were as follows: 360 monthly payments of $628.81. *Objection*, Exh. A.

Mr. Dixon defaulted on the Loan in June of 2015 and his outstanding indebtedness currently stands at $79,887.14. *Objection*, paras. 6-7. Mr. Dixon filed a Chapter 13 petition on November 23, 2015. Vanderbilt filed a Proof of Claim (no. 2-1) on January 19, 2016, listing the secured indebtedness as $77,968.12 and arrearages of $4,119.31. *Proof of Claim no. 2-1*. Attached to that proof of claim were the Loan documents and the pertinent Certificate of Title. *Id.*

The Debtors filed a modified Chapter 13 plan on December 21, 2015, which purported to value the Collateral at $30,000, and provided for payment of $34,216.47 to Vanderbilt over the life of the plan.[1] *Plan,* pg. 6. Vanderbilt objected to the Plan on February 10, 2016, (Doc. no. 22), asserting that the value of the Collateral was more than what Mr. Dixon estimated. *Objection*, para. 9. Vanderbilt moved for an Order Requiring Debtors to Allow Appraisal (Doc no. 36). The motion was withdrawn by Vanderbilt on April 29, 2016 (Doc. No. 45).

The Court held a hearing on the Plan and the Objection on June 16, 2016. Vanderbilt tendered its appraisal as Exhibit 1 at the hearing (the "Appraisal"), provided colored photographs of the property as Exhibit 2, and had the appraiser, James Estep, testify. The extent of Mr. Dixon's proof was his own sworn testimony. The parties stipulated to a $26,700 valuation of the mobile home. The lingering dispute concerns the five acres of land upon which the mobile home is situated. Vanderbilt's Appraisal listed the value of the land at $27,000. The debtor valued the land at $10,000.

---

[1] The value of the collateral is for both the mobile home and the property on which it is situated.

The appraiser testified that the Collateral is approximately five acres, 70% of which is wooded with a swamp. The land was appraised as if it was vacant, with the exception of a septic system. The appraiser testified that he looked at sixteen comparative sales, but only used the best three on the report. The appraiser admitted that he did not walk the property, that none of the comparable sales had swampland, that the subject property had swampland, and that no adjustment was made based on the swampland. The appraiser defended his approach by asserting that inasmuch as the swamp did not impair access from the road to Mr. Dixon's mobile home or the portion of the property where the home sits, the swamp has no effect on the fair market value of the land. *See Appraisal, Vanderbilt's Exh. 1*, pg. 1.

Mr. Dixon testified that the swampland is approximately one-third to one-fourth of a mile long, and about one hundred feet wide. Based upon his familiarity with the subject property, he does not believe $27,000 is a fair appraisal.

## II.

**A.    Governing Standard**

This is a core proceeding pursuant to 28 U.S.C. § 157, as the matter arises under 11 U.S.C. §§ 506(a) and 1325(a)(5)(B). The Court is vested with subject jurisdiction pursuant to 28 U.S.C. §§ 157 and 1334.

In the Plan, Mr. Dixon is attempting to use the "cramdown" provision of § 1325(a)(5)(B). He may do so if the

> (ii) value, as of the effective date of the plan, of property to be distributed under the plan on account of such claim is not less than the allowed amount of such claim; and

3

> (iii) if –
>
>> (I) Property to be distributed pursuant to this subsection is in the form of periodic payments, such payments shall be in equal monthly amounts; and
>>
>> (II) the holder of such claim is secured by personal property, the amount of such payments shall not be less than an amount sufficient to provide to the holder of such claim adequate protection during the period of the plan . . .

11 U.S.C. §§ 1325(a)(b)(B)(ii) – (iii). The valuation question is covered by 11 U.S.C. § 506(a), which provides as follows:

> (1) [a]n allowed claim of a creditor secured by a lien on property in which the estate has an interest . . . is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property . . . and is an unsecured claim to the extent that the value of such creditor's interest . . . is less than the amount of such allowed claim. Such value shall be determined in light of the purpose of the valuation and of the proposed disposition or use of such property, and in conjunction with any hearing on such disposition or use or on a plan affecting such creditor's interest.
>
> (2) If the Debtor is an individual in a case under chapter 7 or 13, such value with respect to personal property securing an allowed claim shall be determined based on the replacement value of such property as of the date of the filing of the petition without deduction for costs of sale or marketing. With respect to property acquired for personal, family, or household purposes, replacement value shall mean the price a retail merchant would charge for property of that kind considering the age and condition of the property at the time value is determined.

11 U.S.C. §§ 506(a)(1)-(2). Prior to the passage of BAPCPA, the term "replacement value," undefined in the Bankruptcy Code, was interpreted by the Supreme Court in *Associates Commercial Corp.* case. *Associates Commercial Corp. v. Rash*, 520 U.S. 953 (1997). Replacement value was "the price a willing buyer in the debtor's trade, business, or situation would pay to obtain like property from a willing seller." *Id.* at 960. So, when a debtor attempted to "cram

down" a secured creditor under § 1325(a)(5)(B), "the value of property retained . . . is the cost the debtor would incur to obtain a like asset for the same proposed . . . use." *Id.* at 965.

Following enactment of § 506(a)(2) in 2005, bankruptcy courts struggled with calculation of "retail value," namely, the value a retail merchant would charge for the collateral. In the quest to assign a number to that value in any case, a Court must hear and evaluate testimony in accordance with the qualification and credibility of expert witnesses. *In re Prewitt*, No. 15-60222, 2015 Bankr. LEXIS 4124, at *15 (Bankr. E.D. Tex. Dec. 8, 2015) (*citing In re Wright*, 460 B.R. 581, 584 (Bankr. E.D.N.Y. 2011); *In re Grind Coffee & Nosh, LLC*, 2011 Bankr. LEXIS 1335, at *6 (Bankr. S.D. Miss. Apr. 4, 2011)). Oftentimes, multiple appraisers provide conflicting valuations, and "[w]hen two appraisal reports conflict, a court must determine the value based on the credibility of the appraisers, the logic of their analys[es] and the persuasiveness of their subjective reasoning." *In re 3G Props., LLC*, No. 10-04763-8-JRL, 2011 Bankr. LEXIS 4634, at * 20-21 (Bankr. E.D.N.C. July 12, 2011) (*quoting In re Sailboat Props., LLC*, No. 10-03718-8-SWH, 2011 Bankr. LEXIS 1316, at *17 (E.D.N.C. Mar. 31, 2011)).

Several factors have emerged to assist courts in weighing conflicting appraisal testimony. Those factors include: the appraiser's education, training, experience, familiarity with the subject of the appraisal, testimony on direct examination, testimony on cross-examination, and the overall ability to substantiate the basis for the valuation presented. *Prewitt*, at *15 (*quoting Anderson v. Mega Lift Sys., LLC (In re Mega Systems, LLC)*, 2007 Bankr. LEXIS 1957, at *8 (Bankr. E.D. Tex., June 4, 2007)); *In re Smith*, 267 B.R. 568, 573-73 (Bankr. S.D. Ohio 2001). It is important to note, however, that a court need not wholly accept the value of one appraiser over another – it can arrive at its own conclusion as to value based on its own interpretation of the evidence. *In re Breakwater Shores Partners, L.P.*, No. 10-61254, 2012 Bankr. LEXIS 1454, at

5

*33 (Bankr. E.D. Tex. Apr. 5, 2012) (*citing in re Holcomb Health Care Servs., LLC*, 329 B.R. 622, 669 (Bankr. M.D. Tenn. 2004)); *see generally Sailboat Props.*, 2011 Bankr. LEXIS 1316. And, if valuation testimony is provided by a property owner, that testimony is admissible, "but to sway the Court it must be persuasive." *In re Tucker*, No. 12-05872-HB, 2013 Bankr. LEXIS, at * 9 (Bankr. D.S.C. Jan. 25, 2013).

**B.     Analysis**

As noted, Vanderbilt was the only party to put forth an appraisal. The appraiser based his work on the Comparative Sales Approach. The Comparative Sales Approach consists of comparing the sales of similar properties with similar characteristics and adjusting the price according to differences between the properties. *Patterson v. LJR Inv., LLC*, 375 B.R. 135, 142 n.17 (Bankr. E.D. Pa. 2007). This approach "is well accepted for non-income producing real estate." *Id.*

The Court concludes that Mr. Estep is a qualified appraiser. His expert status was stipulated to during the hearing, and he testified as an expert witness. Prior to the stipulation, Mr. Estep noted that he is a self-employed real estate appraiser, and has been certified as an appraiser since 1998. He has been retained both by debtors and creditors, and has been employed by debtors' attorneys to testify as to the value of land approximately twenty (20) times. During his testimony, Mr. Estep described the process he used in arriving at the value of $27,000. He looked at three comparable sales and visited the property.

As noted, however, Mr. Estep neither walked the property, nor properly took into account that a swamp was situated on the property. Moreover, none of the comparable sales harbored a swamp. And while Mr. Dixon did not offer any conventional expert appraisal

6

testimony, he testified without persuasive contradiction that the swampland is one-third (1/3) to one-fourth (1/4) of a mile long, and about one hundred (100) feet wide. He did not believe $27,000 was a fair valuation.

Having reviewed the admissible evidence, the Court concludes that the comparative sales analysis offered by the appraiser failed to account for the material distinctions between the subject property and those used for comparison purposes. In sum, the valuation should be adjusted to account for the presence of significant swampland. Having done so, the Court concludes by a preponderance of the evidence that the appraisal should be adjusted downward from $27,000 to $19,000.

It is, accordingly, **ORDERED** that the five acres of land at O'Possum Creek Rd., Victor, WV 25938 is properly valued at $19,000 for the purposes of plan confirmation. It is further **ORDERED** that the value of Vanderbilt's secured collateral, consisting of both the 2006 Doublewide Mobile Home and the entirety of the parcel upon which it sits, is $45,700.